IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| REGINALD VENABLE, | HONORABLE KEVIN MCNULTY |
| Petitioner, | |
| | Civil Action |
| v. | No. 11-5250 (KM) |
| STEVEN JOHNSON, | **OPINION** |
| Respondent. | |

**MCNULTY, District Judge:**

## I.    INTRODUCTION

Petitioner Reginald Venable has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Am. Pet., ECF No. 7.) For the reasons stated herein, the petition shall be denied and no certificate of appealability shall issue.

## II.    BACKGROUND

The New Jersey Superior Court, Appellate Division, on direct appeal, summarized the facts underlying Petitioner's conviction as follows:[1]

> According to the State's proofs, at about 11 a.m. on September 8, 2001, Maximiliano Carabantes cashed his payroll check in the amount of $307 at a check-cashing store at Clinton and West Front Streets in Plainfield and then walked to a nearby grocery store where he bought a chicken for $10. Unknown to Carabantes, [Petitioner] and Rashon Dixon had watched him cash his check and decided to rob him. When Carabantes walked out of the grocery store, Dixon stopped him, threatened him with a handgun and forced him face first into a wall. [Petitioner] then took $300 from Carabantes' left shirt pocket and $20 from his wallet. As the robbers walked away, Dixon waved the handgun to stop Carabantes from

---

[1] State court factual findings are presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). As Petitioner has not rebutted the factual findings of the Superior Court of New Jersey by clear and convincing evidence, this Court will rely on those findings.

following. As they walked away, [Petitioner] divided the money, giving Dixon $140 and keeping the remainder.

Meanwhile, Carabantes found a friend who spoke English, and the two men flagged a Plainfield police car driven by Officer John Henderson. Carabantes' friend translated details of the robbery, relating Carabantes' description of two black men with muscular builds, one wearing a red shirt and black pants and the other wearing a black shirt with black pants. Henderson radioed this information to the police dispatcher and drove in the direction where Carabantes said the men had walked. Henderson saw [Petitioner] and Dixon walking together about 500 feet south of West Front Street on Clinton Avenue and noted that they fit the description of the robbers. He radioed the dispatcher that he had located two suspects and drove back to the corner of west Front Street and Clinton Avenue to pick up Carabantes to see if he could identify the suspects.

When Dixon and [Petitioner] saw Henderson's police car pass, they decided to get rid of the handgun. Dixon threw the gun in some weeds next to a fence bordering a driveway for a hot dog stand. [Petitioner], now accompanied by a woman named Crystal Collins, followed Dixon down the driveway, and the three walked back to Clinton Avenue. [Petitioner] and Collins crossed the street and continued walking south. Dixon remained on the opposite side of the street, walking in the same direction and slightly behind the other two.

It was at this time that Officer Henderson drove by with Carabantes and his friend in the car. As they approached [Petitioner] and Dixon, now on opposite sides of the street, Carabantes identified them as the two men who robbed him. Henderson radioed this information to headquarters and requested backup to make an arrest. Another patrol car arrived and stopped [Petitioner] and Collins while Henderson apprehended Dixon. Both men were arrested and searched. [Petitioner] was carrying $190 in cash and Dixon, $140. Within a few minutes Officer Edward Hafeken located a loaded and operational BB gun, which resembled a handgun and was identified by Carabantes.

Both [Petitioner] and Dixon were indicted for first-degree robbery and related weapons offenses. Prior to trial, Rashon Dixon entered a guilty plea to first-degree armed robbery in exchange for a plea recommendation of a second-degree sentence of seven years in State prison with five years, eleven months and fourteen days of parole ineligibility as mandated by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. In accepting the plea bargain, Dixon agreed to testify for the State at [Petitioner's] trial.

At trial, Dixon testified he met [Petitioner] on the morning of September 8, 2001, and [Petitioner] asked him to help him get some money, showing him a black BB gun. They walked to a check-cashing place to scout a likely victim, and they saw Carabantes leave the cashier. Dixon said he took the gun from [Petitioner] and told the victim to "get against the wall." As he held the gun on Carabantes, [Petitioner]

> took the money. Dixon then related that he and [Petitioner] walked away and were
> joined by Crystal Collins. Dixon admitted he threw the gun into the weeds near the
> hotdog stand after seeing a police car.

*State v. Venable*, No. A-4618-02T5, slip op. at 2-5 (N.J. Super. Ct. App. Div. Oct. 15, 2004)

(available at ECF No. 14-5).

On January 14, 2003, a jury found Petitioner guilty of: (i) first-degree armed robbery,

N.J. Stat. Ann. § 2C:15-1; (ii) third-degree unlawful possession of a handgun, N.J. Stat. Ann. §

2C:39-5b; (iii) second-degree possession of a firearm for an unlawful purpose, N.J. Stat. Ann. §

2C:39-4a; and (iv) second-degree possession of a firearm by a previously convicted person, N.J.

Stat. Ann. § 2C:39-7. (*Id.* at 1-2; *see also* Jan. 14, 2003 Trial Trs., ECF Nos. 14-41 and 14-42.)

On March 28, 2003, the trial court sentenced Petitioner "to an aggregate term of fifty years

imprisonment with a twenty year period of parole ineligibility and five years of parole

supervision upon release[.]" (*Id.* at 2; *see also* Mar. 28, 2003 Sentencing Tr., ECF No. 14-43.)

The Appellate Division affirmed Petitioner's conviction and sentence on October 15, 2004. (*Id.*

at 8.) The New Jersey Supreme Court denied certification of Petitioner's direct appeal on May

23, 2005. (ECF No. 14-6.)

Petitioner thereafter filed two separate post-conviction relief ("PCR") applications in

state court. Petitioner filed his first PCR petition on or about July 19, 2005. (*See, e.g.*, ECF No.

14-27 at 1.) The PCR court held a hearing on Petitioner's first PCR application on April 3, 2007.

(PCR Hr'g Tr., ECF No. 9-44.) On that date, the PCR court issued an order denying Petitioner's

first PCR petition "for the reasons stated on the record on April 3, 2017." (ECF No. 14-15.) The

Appellate Division affirmed the denial of Petitioner's first PCR petition on May 4, 2010. *State v.*

*Venable*, No. A-6315-06T4, slip op. at 7 (N.J. Super. Ct. App. Div. May 4, 2010) (available at

ECF No. 14-20). The New Jersey Supreme Court denied certification of Petitioner's first PCR appeal on September 10, 2010. (ECF No. 14-23.)

Petitioner filed his second PCR petition on or about March 8, 2011. (*See, e.g.*, ECF No. 14-27 at 2.) The PCR court held a hearing regarding these claims on February 15, 2013. (PCR Hr'g Tr., ECF No. 14-45.) The PCR court issued an order and accompanying written decision denying Petitioner's second PCR petition on June 4, 2013. (ECF No. 14-27.) The Appellate Division affirmed the denial of Petitioner's second PCR petition on July 13, 2015. *State v. Venable*, No. A-0999-13T3, slip op. at 11 (N.J. Super. Ct. App. Div. July 13, 2015) (available at ECF No. 14-31). The New Jersey Supreme Court denied certification of Petitioner's second PCR appeal on October 6, 2015. (ECF No. 14-34.)

Petitioner filed his original § 2254 petition on September 2, 2011. (ECF No. 1.) At that time, this matter was assigned to District Judge Dennis M. Cavanaugh. On August 1, 2012, Judge Cavanaugh stayed this matter in light of Petitioner's then-pending second PCR petition. (ECF No. 3.) On November 23, 2015, the Court received a letter from Petitioner stating that the New Jersey Supreme Court had denied certification with respect to Petitioner's second PCR petition, and requesting that the Court lift its stay of this matter. (ECF No. 6.) On that date, Petitioner also filed a motion to amend his habeas petition to assert certain additional claims. (ECF No. 7.) Judge Cavanaugh having retired from the bench, on December 1, 2015, the matter was reassigned to me. (ECF No. 5.)

On January 19, 2016, I issued a Memorandum and Order which, *inter alia*: (1) lifted the stay of this matter; (2) granted Petitioner's motion to amend; (3) performed a substantive analysis with respect to "[P]etitioner's claim in his amended habeas petition that PCR counsel was ineffective"; (4) denied habeas relief and declined to issue a certificate of appealability on

4

that claim; and (5) ordered Respondent to "file a full and complete answer to [the balance of the claims asserted in] the amended habeas petition." (ECF No. 8.) Respondent filed an answer on April 22, 2016. (ECF No. 14.) Petitioner acknowledged receipt of Respondent's answer by way of a letter dated May 5, 2016 (*see* ECF No. 15), but did not file any reply.

## III. STANDARD OF REVIEW

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution, laws, or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104–132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable-application inquiry should ask whether the state court's application of clearly

established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner has the burden of proof and, with respect to § 2254(d)(1), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, the court will assume that, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018). Additionally, AEDPA deference is not excused when state courts issue summary rulings. For example, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 62 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

## IV. ANALYSIS

Petitioner raises the following points for this Court's review:

Ground One: Petitioner was denied his [Sixth] Amendment right to effective assistance of counsel because trial counsel failed to advi[se] Petitioner that he faced an extended term of incarceration if he was convicted at trial . . .

Ground Two: Petitioner was denied his [Sixth] Amendment right to confrontation [because the unidentified individual who translated Mr. Carabantes' account of the robbery to police did not testify at trial].

Ground Three: Petitioner was deprived of his [Fourteenth] Amendment right to due process and a fair trial [because]:
(A) [Petitioner's] co-defendant [Rashon Dixon] was allowed to testify in prison garb while in shackles;
(B) [the] trial court failed to give the proper jury instructions limiting the use of [Rashon Dixon's] guilty plea [by failing to expressly note] that [the jury] cannot [use a] co-defendant's guilty plea[] as substantive evidence of petitioner's guilt; and
(C) [the] trial court erred in charging the jury regarding accomplice liability.

Ground Four:
(A) [Petitioner's second] PCR petition should not have been procedural[ly] barred;
(B) [Petitioner] established a *prima facie* case of counsel's ineffectiveness, in that trial counsel failed to inform him properly regarding his sentencing exposure and PCR counsel failed to pursue this claim in the first petition. . . ; and
(C)[i] trial counsel failed to effectively cross-examine [Rashon] Dixon[;] and [ii] [the trial court improperly denied] a [request] that was posed by the jury at the time of deliberation [to review a copy of Rashon Dixon's] statement [to police] . . . .

(Am. Pet., ECF No. 7 (capitalization in original omitted).)

### A. Ineffective Assistance of Trial Counsel

Petitioner claims that he is entitled to habeas relief because his counsel rendered ineffective assistance at trial. More specifically, Petitioner asserts that his trial counsel, Howard G. Golden, Esq., failed to (1) "advi[se] Petitioner that he faced an extended term of incarceration if he was convicted at trial" (*see* Am. Pet. at Ground One); and (2) "effectively cross-examine

[Rashon] Dixon" (*id.* at Ground Four, sub-point C). These claims are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).

Under *Strickland*, a habeas petitioner first "must show that counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). With respect to evaluating whether counsel's performance was deficient under *Strickland*, the "proper standard . . . is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential [and] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Pursuant to *Strickland*, a habeas petitioner must also demonstrate that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299. In other words, a petitioner must additionally demonstrate that counsel's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 692-93. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

8

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Shedrick*, 493 F.3d at 299.

In addition, "[w]hen a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, '[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable,' which 'is different from asking whether defense counsel's performance fell below *Strickland*'s standard.'" *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). "Federal habeas review of ineffective assistance of counsel claims is thus 'doubly deferential.'" *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

### 1. Trial Counsel's Purported Failure to Advise Petitioner of His Sentencing Exposure

Petitioner asserts that Mr. Golden was ineffective because he failed to "advi[se] Petitioner that he faced an extended term of incarceration if he was convicted at trial." (*See* Am. Pet. at Ground One.) Petitioner claims that "due to counsel's failure the Petitioner rejected a favorable plea offer of 10 years subject to 85% parole ineligibility and instead was sentence[d] to a 50 year extended term." (*Id.*) In its opinion affirming the denial of Petitioner's second PCR petition, the Appellate Division expressly found this argument to be "without factual merit." *Venable*, slip op. at 7-8 (N.J. Super. Ct. App. Div. July 13, 2015). In so holding, the Appellate Division correctly noted that the record conclusively refuted that claim:

> The transcript of a pretrial status conference on May 6, 2002, includes [Mr. Golden's] statement that [Petitioner] was "extended-term eligible" on the first-degree robbery charge, which the attorney stated he would discuss with [Petitioner] before a final decision on a ten-year plea offer.
>
> The transcript of the conference on June 3, 2002, includes the judge's direct colloquy with [Petitioner] regarding his decision to reject the State's final plea offer of nine years imprisonment subject to [NERA's] eighty-five percent parole ineligibility requirement[:]

9

THE COURT: You want to turn the offer down and go to trial?

[PETITIONER]: Yes.

. . . .

THE COURT: . . . You face up to, actually [sic] 20 years to life [in light of your "persistent offender" status]. On that, the presumptive term would be 50 years.

So that means, with the aggravating and mitigating factors at sentencing being equal, you get 50 years, with 85 percent of parole ineligibility, which would be equivalent to 42 years, six months and two days.

. . . .

You understand that's what you're facing . . . if you go to trial . . . ?

[PETITIONER]: Yes.

THE COURT: Still want to turn down nine with 85, concurrent to seven, knowing that?

[PETITIONER]: Yes.

. . . .

THE COURT: Did you weigh all of the proofs, the State's proofs with [defense counsel], calculate your chances at trial?

[PETITIONER]: Yes, yes.

Thus, contrary to [Petitioner's] allegations in his second PCR petition, he knew seven months before his trial that he was facing a sentence of up to life imprisonment with a "presumptive" term of fifty years. With that knowledge, [Petitioner] clearly expressed his intention to reject the plea offer and go to trial.

*Venable*, slip op. at 8-11 (N.J. Super. Ct. App. Div. July 13, 2015).

In light of the foregoing, I find that the Appellate Division's rejection of Petitioner's current Ground One ineffective of assistance of counsel claim constituted a reasonable application of the *Strickland* standard. Indeed, the state courts could not have found either deficient performance or prejudice, because both the court and counsel expressly advised the

Petition on the record as to his exposure. "[Petitioner] was informed in open court that he could be sentenced to an extended term beyond twenty years imprisonment" if he proceeded to trial. *Venable*, slip op. at 7-8 (N.J. Super. Ct. App. Div. July 13, 2015). Petitioner himself represented to the trial court that he had conferred with Mr. Golden on this issue, and stated on the record that he had rejected the State's plea offer fully understanding that, if he went to trial and was convicted, he could receive a sentence of 50 years' imprisonment with an 85 percent period of parole ineligibility. I therefore reject the contention that Mr. Golden rendered ineffective assistance by failing to advise Petitioner of his potential sentencing exposure.

### 2. Trial Counsel's Cross-Examination of Rashon Dixon

Petitioner also asserts that Mr. Golden was ineffective because he allegedly failed to "effectively cross-examine [Rashon] Dixon" (*id.* at Ground Four, sub-point C). Petitioner does not provide any additional facts, context, or other information in support of this claim. (*See id.*). He does not, for example, identify any particular questions trial counsel failed to ask Mr. Dixon. Nor does he in any way explain how counsel's failure to ask those unspecified questions prejudiced his defense. (*Id.*)

Petitioner presented this claim on direct appeal. (*See* Pet'r's Oct. 20, 2003 Appeal Br. at 29, ECF No. 14-2.) There, Petitioner argued that "there [were] major inconsistencies in the Dixon statement of September 10, 2001 and his trial testimony [and] Dixon's version of the event did not even square with Mr. Carabante's narrative. An alert trial attorney attuned to these contradictions had fertile ground for effective and withering cross-examination. Mr. Venable's trial attorney did not seize this opportunity." (*Id.* at 29-30.)

The Appellate Division found Petitioner's assertion "that his attorney should have conducted a more vigorous or effective cross-examination of Dixon" to be "without merit." *See*

11

*Venable*, slip op. at 7, 8 (N.J. Super. Ct. App. Div. Oct. 15, 2004). In so finding, the Appellate Division specifically noted that "counsel cross-examined [Mr. Dixon] at length and pointed out various inconsistencies in his testimony." *Id.* at 7.

I have reviewed the transcript of Mr. Golden's cross-examination of Mr. Dixon. (*See* Jan. 9, 2003 Trial Tr. at 33-57, ECF No. 14-39) I find that the Appellate Division's description or characterization of the cross-examination is supported by the record. Even if I were to disagree, however, I would be constrained to find that Petitioner has failed to present any facts, context, or other information to suggest that counsel's cross-examination of Mr. Dixon was deficient. There is no basis for a conclusion that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

In light of the foregoing considerations, I find that the state courts' rulings rejecting claims of ineffective assistance of trial counsel are neither contrary to nor an unreasonable application of *Strickland* and its progeny. Nor have those rulings resulted in decisions based on unreasonable determinations of the facts in light of the evidence presented during Petitioner's state court proceedings. I will therefore deny habeas relief as to these claims.

## B. Ineffective Assistance of PCR Counsel

Petitioner relatedly claims that the attorney representing him in his first PCR proceeding, Evelyn F. Garcia, Esq., rendered ineffective assistance because she failed to argue that Mr. Golden "failed to inform [Petitioner] properly regarding his sentencing exposure." (Am. Pet., Ground Four, sub-point B.) For the reasons discussed above, I find that there was no such ineffectiveness on the part of Mr. Golden, and, as detailed in my January 19, 2016 Memorandum and Order, I have already denied this claim and ruled that no certificate of appealability shall issue. (*See* ECF No. 8.) No additional discussion regarding the merits of this claim is required.

## C. Confrontation Clause Error

Petitioner asserts that he was deprived of his Sixth Amendment right to confrontation because the unidentified friend who translated robbery victim Maximiliano Carabantes' account of that crime to Officer John Henderson "did not testify at trial and was never identified to the [P]etitioner by the State." (Am. Pet. at Ground Two.) The Appellate Division explored the merits of this claim in its opinion affirming the denial of Petitioner's first PCR petition. That Court properly found that the concerns of *Crawford* were not implicated by the absence of the translator:

> Citing *Crawford v. Washington*, [541 U.S. 36], (2004), [Petitioner] argues . . . that he was denied his Sixth Amendment right of confrontation because his attorney failed to call as a witness the person who assisted the victim of the robbery by interpreting his communications with a responding police officer. We disagree.
>
> The Sixth Amendment "prohibit[s] the use of out-of-court testimonial hearsay, untested by cross-examination, as a substitute for in-court testimony." *State ex rel J.A.*, 195 N.J. 324, 342 (2008). The Confrontation Clause's "ultimate goal is to ensure the reliability of evidence . . . by testing [it] in the crucible of cross-examination." *Crawford, supra*, [541 U.S. at 61]. Thus, the *Crawford* Court held that "[t]estimonial statements of witnesses absent from trial [will be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59.
>
> Here, the victim of the robbery testified at trial, identified [Petitioner] as the person who robbed him, and was thoroughly cross-examined by defense counsel. The so-called "interpreter" did not witness any aspect of the robbery. This person's involvement was limited to assisting the victim, who did not speak English, in reporting the event to a police officer who happened to be driving nearby. The concerns articulated by the Court in *Crawford* are not applicable to this individual.

*Venable*, slip op. at 5-6 (N.J. Super. Ct. App. Div. May 4, 2010).

The Confrontation Clause of the Sixth Amendment, applicable to the States through the Fourteenth Amendment, requires that a criminal defendant be given the right "to be confronted with the witnesses against him." U.S. Const. amends. VI, XIV; *see also Richardson v. Marsh*, 481 U.S. 200, 206 (1987). The Confrontation Clause bars "admission of testimonial statements

of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 56; *see also Davis v. Washington*, 547 U.S. 813 (2006).

In considering whether a Confrontation Clause violation occurred, I inquire into two issues. *See United States v. Moreno*, 809 F.3d 766, 773 (3d Cir. 2016) ("[the] Confrontation Clause inquiry is twofold.") Initially, I must determine whether the challenged statement "qualifies as testimonial." *Id.* (citing *Davis*, 547 U.S. 813). "[S]tatements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial are testimonial." *Id.* (citing *United States v. Hinton*, 423 F.3d 355, 360 (3d Cir. 2005)). "The core class of testimonial statements includes 'material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [it also includes] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.'" *Id.* at 773-74 (citing *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009). If, and only if, the challenged "statement is testimonial, then the Confrontation Clause requires unavailability and a prior opportunity for cross-examination" before that statement can be admitted at trial. *Id.* at 774 (citations and internal quotations omitted).

Here, the uncontroverted factual findings of the state court make clear that the Confrontation Clause was not implicated here. The relevant opinion of the Appellate Division makes clear that the unidentified person who translated Mr. Carabantes' account of the September 8, 2011 robbery to police did not himself witness the crime, did not testify at trial, and did not – at any time – provide a testimonial statement to police inculpating Petitioner, much less

one that was used against Petitioner during trial. *Venable*, slip op. at 6 (N.J. Super. Ct. App. Div. May 4, 2010). Instead, "[t]his person's involvement was limited to assisting the victim, who did not speak English, in reporting the event to a police officer who happened to be driving nearby." *Id.* As such, I find that Petitioner's Sixth Amendment right to confrontation was not implicated by that unidentified individual's contemporaneous translation to police of Mr. Carabantes' account of the robbery. *See United States v. Sardinas*, 386 F. App'x 927, 942 (11th Cir. 2010) (Confrontation Clause not implicated where transcribers who produced initial drafts of English-translated transcripts of Spanish audio and video recordings played at trial did not themselves testify at trial); *accord United States v. Vidacak*, 553 F.3d 344, 352 (4th Cir. 2009) "except in unusual circumstances, an interpreter is no more than a language conduit") (citing *United States v. Martinez–Gaytan*, 213 F.3d 890, 892 (5th Cir. 2000) (internal quotations omitted). Petitioner cites no clearly established Supreme Court precedent which supports a different conclusion. *Accord Sardinas*, 386 F. App'x at 942 (noting that Supreme Court has not addressed whether a defendant's "rights under the Confrontation Clause were violated" where transcribers who produced initial drafts of English-translated transcripts did not testify at trial).

More fundamentally, the victim himself testified at trial regarding the facts of the robbery; the State's case did not rest on the accuracy, or not, of his out of court statement to the police. I therefore likewise find that the Appellate Division's determination that "[t]he concerns articulated by the Court in *Crawford* are not applicable to [the Mr. Carabantes' translator]" is not an unreasonable application of *Crawford* and its progeny.

In light of the foregoing, I find that Petitioner's Confrontation Clause claim fails to provide a basis for habeas relief. The arguments advanced in support of this claim were "adjudicated 'on the merits' in state court" and Petitioner has failed to demonstrate that "the state

court's adjudication [of that claim] 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law.'" *See Johnson v. Lamas*, 850 F.3d 119, 133-34 (3d Cir. 2017) (quoting 28 U.S.C. 2254(d)(1)).

### D. Rashon Dixon Testifying in Prison Garb and While Shackled

Petitioner asserts that he was denied of his rights to due process and a fair trial because his co-defendant, Rashon Dixon, testified in prison garb, while shackled. (Am. Pet. at Ground Three, sub-point A.) The Appellate Division explored the merits of this claim in its opinion affirming the denial of Petitioner's first PCR petition:

> [A]lthough [Mr. Dixon] testified in prison garb, the record reflects that he was seated in the witness box when the jury was brought back into the courtroom and there was no evidence that the witness was shackled while so seated. Furthermore, in *State v. Kuchera*, 198 N.J. 482, 500 (2009), our Supreme Court rejected, "as a matter of law or constitutional doctrine, that a witness can never testify in prison garb." Rather, the Court left the decision whether to permit a witness to testify in prison garb to the sound discretion of the trial court. *Id.* at 501. Here, [Petitioner] has not presented any evidence to support the conclusion that the trial court abused its discretion in permitting the witness to testify while dressed in prison garb.

*Venable*, slip op. at 4-5 (N.J. Super. Ct. App. Div. May 4, 2010).

The United States Constitution guarantees criminal defendants the right to a fair trial before an impartial jury. U.S. Const. amends. V, VI, and XIV. In certain circumstances, security measures can interfere with a criminal defendant's ability to receive a fair trial. In *Illinois v. Allen*, 397 U.S. 337 (1970), the Supreme Court recognized that requiring a criminal defendant to appear in shackles before a jury may result in an unfair trial. As the *Allen* Court explained, "[n]ot only is it possible that the sight of shackles . . . might have a significant effect on the jury's feelings about the defendant, but the use of th[e] technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Id.* at 344. Because shackling a defendant during trial is an "inherently prejudicial

practice," it "should be permitted only where justified by an essential state interest specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986); *see also Deck v. Missouri*, 544 U.S. 622, 633 (2005) (noting that the appearance of a criminal defendant in shackles "almost inevitably affects adversely the jury's perception of the character of the defendant"). Similarly, in *Estelle v. Williams*, 425 U.S. 501, 506 (1976), the Supreme Court held that requiring a defendant to wear "identifiable prison clothes" violated his due process right to a fair trial. The Court explained: "The constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play." *Id.* at 504-05.

The foregoing decisions, however, only speak to the rights of criminal *defendants* at trial; they do not speak to the attire of witnesses. Importantly, "[t]he Supreme Court . . . has never held that the prohibition on compelling a defendant to wear prison garb applies to witnesses. Moreover, no extension of the prohibition to witnesses follows from the reasoning of the relevant Supreme Court decisions [cited above]." *Green v. Warren*, No. 2:12-cv-6148 (ES), 2013 WL 6865420, at *14 (D.N.J. Dec. 20, 2013); *accord Villegas v. D'Ilio*, No. 2:15-cv-3420 (SDW), 2016 WL 706195, at *6 (D.N.J. Feb. 22, 2016) ("The Supreme Court has . . . never extended the *Estelle* rule regarding prison garb to non-defendant witnesses"), *cert. of appealability denied*, No. 16-1649 (3d. Cir. May 26, 2016).

I find that the fact that Mr. Dixon testified on behalf of the State in prison garb and shackles[2] – even if true – did not violate Petitioner's constitutional rights under "clearly

---

[2] While it is undisputed that Mr. Dixon testified in prison garb (*see* Resp't Answer 21, ECF No. 14-1), there does not appear to be any basis in the record for a conclusion that that Mr. Dixon was shackled when he testified. (*See, generally,* Jan. 14, 2003 Trial Tr. 6-58, ECF No. 14-39.)

established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *accord United States v. Brooks*, 125 F.3d 484, 499 (7th Cir. 1997) (noting that "a defendant has the right for his own witness to appear without physical restraints[,]" but that no similar right exists with respect to government witnesses). Instead, it fully appears that this portion of Petitioner's Ground Three claim was "adjudicated 'on the merits' in state court" and that "the state court's adjudication [of that claim in no way] 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law.'". *Lamas*, 850 F.3d at 133-34 (quoting 28 U.S.C. § 2254(d)(1)).

Moreover, even if I were to conclude that the fact that a witness testified for the prosecution while dressed in prison garb and in shackles could qualify as a constitutional violation, I would nonetheless find that this purported constitutional error was harmless. For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Harmless error analysis has been applied to claims involving the use of prison clothing and shackles. *See Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005); *United States v. Martin*, 964 F.2d 714, 721 (7th Cir. 1992).

Indeed, the records makes clear that the jury was well aware that Mr. Dixon "admitted his guilt in this case and testified on behalf of the State." (*See, e.g.*, Jan 8, 2003 Trial Tr. 25, ECF No. 14-37 (defense counsel indicating during opening statements that Mr. Dixon had already been convicted and sentenced for the September 8, 2001 robbery of Mr. Carabantes); *accord* Jan. 14, 2003 Jury Charge Tr. 11, ECF No. 14-40.) Indeed, the defense strategy was to portray Dixon as the true culprit, who had made a plea deal to minimize his prison sentence. That strategy could

only have been aided by any incriminating inference the jury would have drawn from shackles or prison garb. That Mr. Dixon would testified in prison garb, while shackled – if that occurred – would not have surprised the jury or prejudiced Petitioner's defense. "No prejudice can result from seeing that which is already known." *Green*, 2013 WL 6865420, at *14 (quoting *Stahl v. Henderson*, 472 F.2d 556, 557 (5th Cir. 1973)). And the Petitioner has failed to articulate how Mr. Dixon's in-court appearance had a substantial and injurious effect on the jury's verdict. *See id.* at *14 (no prejudice to defendant where two government witnesses testified while wearing prison garb because "the criminal records of the two witnesses were provided to the jurors in the course of their testimonies."); *see also Brooks*, 125 F.3d at 499 (witness's testimony about her convictions and prisoner status dispelled any prejudice arising from her prison garb); *United States v. Adams*, 1 F.3d 1566, 1584 (11th Cir. 1993) (citing cases and finding no prejudicial error as a result of co-defendants testifying in prison clothes); *Cook v. Beto*, 425 F.2d 1066, 1067 (5th Cir. 1970) (no prejudice flowed from an accused's co-defendant being brought into the courtroom for identification wearing a prison uniform), *cert. denied*, 400 U.S. 944; *Johnson v. Spalding*, 510 F. Supp. 164 (E.D. Wash. 1981) (in habeas petition, no prejudice flowed from witnesses testifying in prison clothing), *aff'd*, 669 F.2d 589 (9th Cir.), *cert. denied*, 459 U.S. 942 (1982).

In sum, and for the additional reasons detailed above, I find that the arguments advanced by Petitioner in Ground Three, sub-point A, fail to provide a basis for habeas relief.

## E. Errors in Jury Instructions

In Ground Three, Petitioner asserts that he was denied his right to a fair trial and due process of law based on errors in the jury charge. (Am. Pet. at Ground Three, sub-points B and C.) More specifically, Petitioner claims that the trial court: (1) "failed to give the proper jury

19

instructions limiting the use of [Rashon Dixon's] guilty plea" because it "did not inform the jury that they could not use the fact that [Mr. Dixon] pled guilty as substantive evidence of [Petitioner's] guilt" (*id.* at sub-point B); and (2) "erred in charging the jury regarding accomplice liability" where it "deviated from the proper jury charge for accomplice liability when it emphasized the descriptive word accomplice" and "failed to properly define [] the elements of accomplice liability in sequence with specific reference to the facts in the case." (*Id.* at sub-point C.)

"[A]n error in the instructions to the jury" may violate due process. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). "The question [during habeas review] is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violate[d] due process." *Id.* (citation and internal quotation marks omitted); *accord Waddington v. Sarausad*, 555 U.S. 179, 191 (2009). In that regard, it is also "well established" that the challenged instruction "may not be judged in artificial isolation," but must be viewed in the context of the overall charge and the trial record. *Cupp v. Naughton*, 414 U.S. 141, 146 (1973). Moreover, where the alleged error consists of failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155. In short, it is the rare case in which "an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment." *Id.* at 154; *accord Middleton v. McNeil*, 541 U.S. 433, 437 (2004) ("not every ambiguity, inconsistency, or deficiency in a jury instruction[] rises to the level of a due process violation."). Indeed, "the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).

Instead, a habeas petitioner must establish that the instructional error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. For example, due process is violated where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." *Smith v. Horn*, 120 F.3d 400, 416 (3d Cir. 1997); *see also Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011) (noting that due process is violated when "the instruction contained some ambiguity, inconsistency, or deficiency," and "there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt.") (internal quotation marks omitted).

*1. The State Courts' Resolution of Petitioner's Jury Instruction Claims*

As to subpoint C, Petitioner advanced substantially the same arguments regarding the accomplice liability charge on direct appeal. (*See* Pet'r's Oct. 20, 2003 Appeal Br., Points Two and Three, ECF No. 14-2.) The Appellate Division found Petitioner's "arguments respecting the trial judge's instructions on accomplice liability [to be] without merit. [Petitioner] specifically requested the accomplice testimony charge, and [the trial judge] tracked the model charge carefully avoiding reference to [Petitioner] or Dixon as an accomplice." *Venable*, No. A-4618-02T5, slip op. at 6 (N.J. Super. Ct. App. Div. Oct. 15, 2004). The Appellate Division also noted that "[n]o objection was taken by [Petitioner] to the charge." *Id.* at 7. I have reviewed the relevant portions of the trial record and agree with the Appellate Division's summary. (*See, e.g.,* Jan. 9, 2003 Trial. Tr. 64, ECF No. 14-39 (defense counsel requesting that "the court to charge the accomplice testimony charge as provided by the court" and confirming that Petitioner agreed with that language); Jan. 14, 2003 Trial Tr. vol. 3, 9-10, ECF No. 14-41 (trial judge reading

relevant portions of jury charge on accomplice liability in response to jury's request during deliberations "for the definition of accomplice.").)

As to subpoint B, Petitioner raised substantially the same arguments during PCR proceedings, albeit in support of his claim that he received ineffective assistance of counsel. There, Petitioner argued that his counsel was ineffective for failing to object when the trial court did not provide an appropriate instruction limiting the use of Mr. Dixon's guilty plea. *See Venable*, slip op. at 3 (N.J. Super. Ct. App. Div. May 4, 2010). This specific argument does not appear to have been directly addressed by the PCR court in its oral opinion. (*See, generally*, Apr. 3, 2007 PCR Hr'g Tr., ECF No. 14-44.) The Appellate Division, however, explicitly rejected Petitioner's argument that "the PCR court erred in not ruling on the ineffective assistance of [counsel] issue regarding[, *inter alia*,] the trial judge's error . . . [in failing to advise] the jury [that it] could not use Dixon's guilty plea as substantive evidence of guilt" as "lack[ing] sufficient merit to warrant comment in a written opinion." *See Venable*, slip op. at 3, 7 (N.J. Super. Ct. App. Div. May 4, 2010).

2. *Application*

As noted above, Petitioner claims that the trial court failed to properly instruct the jury "that they could not use the fact that [Mr. Dixon] pled guilty as substantive evidence of [Petitioner's] guilt" (Am. Pet., Ground Three at sub-point B), and improperly "deviated from the proper jury charge for accomplice liability." (*Id.* at sub-point C.) I have reviewed those portions of the trial court record which are relevant to these claims and find that the jury instructions were proper. None of the challenged instructions in any way eased the state's burden of proving any element of the charged offenses. Indeed, there does not seem to have been any error of state law, much less one that violated due process. With respect to Petitioner's claim that the accomplice

22

liability charge improperly deviated from the proper jury charge, the Appellate Division opinion makes it clear that the trial judge tracked the model charge carefully and avoided references to Petitioner or Dixon as an accomplice. My review confirms that Petitioner specifically requested the "accomplice" language he is now challenging and that he did not object to the accomplice language ultimately used in the jury charge. (*See, e.g.*, Jan. 9, 2003 Trial. Tr. 64, ECF No. 14-39; Jan. 14, 2003 Trial Tr. vol. 3, 9-10, ECF No. 14-41.)

Trial court's charge to the jury also included detailed instructions on assessing the credibility of Rashon Dixon as a cooperating defendant. The charge expressly notes that Dixon "admitted his guilt in this case and testified on behalf of the State. The law requires that [his testimony] be given scrutiny" including consideration of "whether [it] was influenced by the hope or expectation of any favorable treatment." (Jan. 14, 2003 Jury Charge Tr. 11-12 (ECF No. 14-40.) Neither the omission of the specific admonition that Mr. Dixon's plea of guilty was not substantive evidence of Petitioner's guilt, nor the accomplice language utilized in the final jury charge "by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. at 72 (citing *Cupp*, 414 U.S. at 147) (internal quotations omitted).

In light of the foregoing, I conclude that the Appellate Division's prior rejection of the claims being advanced by Petitioner in Ground Three at sub-points B and C as being "without merit" is neither contrary to, nor an unreasonable application of, clearly established federal law. Nor do these rulings represent an unreasonable determination of the facts in light of the evidence presented during state court proceedings. Petitioner has failed to present any basis for a contrary finding. Petitioner is not entitled to habeas relief on his claims of error in the jury instructions.

**F. Trial Court's Denial of Jury's Request to Review Rashon Dixon's Statement to Police**

In Ground Four, Petitioner asserts that the trial court erred by refusing the jury's request during deliberations to receive a copy of the September 10, 2001 statement which Rashon Dixon made to police. (Am. Pet. at Ground Four, sub-point C.) While Petitioner claims that this statement "was the linchpin in the entire case against [him]," he fails to articulate why this is so. (*Id.*) Indeed, Petitioner provides no details about the information contained in that statement.

I have reviewed the record of state court proceedings and note the following additional facts which help illuminate the basis of Petitioner's claim: First, Mr. Golden confronted Mr. Dixon with his September 10th statement during cross-examination. (*See* Jan. 9, 2003 Trial Tr. 34, ECF No. 14-39.) Second, Mr. Golden did not explore the substance of the prior statement at length. During recross, however, the following exchange occurred:

> Q. [Mr. Golden]. Mr. Dixon, isn't it a fact that you asked [Petitioner], or at least in your statement didn't you tell the police on September 10[th] that [Petitioner] asked if you wanted to make some money. I asked him how. He said by robbing someone. I asked him if he had a gun. He said yeah and gave he the pellet gun. Isn't that what you told them?
> A [Mr. Dixon]. Yes.

(*See* Jan. 9, 2003 Trial Tr. 57, ECF No. 14-39.) The point of the examination was to demonstrate an inconsistency: In his police statement, Dixon said Petitioner handed the pellet gun to him, but at trial, he Dixon testified that the he himself removed the gun from Petitioner's waistband. (*Id.*) Thus the prior statement to the police inculpated Petitioner in the robbery at least as much as Dixon's trial testimony did. Third, while Mr. Golden had Mr. Dixon's statement marked as Exhibit D-1 (*see* Jan. 9, 2003 Trial Tr. 34, ECF No. 14-39.), he never moved it into evidence. (*Id.* at 59 (Exhibits D-2 and D-3 – but not Exhibit D-1 – formally received as evidence).) Fourth, Mr. Golden's opening statement to the jury confirms that the failure to formally admit Mr. Dixon's police statement into evidence was deliberate. (*See* Trial Tr. 27-28, ECF No. 14-37

(noting that "[w]hile reports and statements may sometimes be marked for identification, they are more often than not [inadmissible] into evidence because of our court rules" and that "more often than not [] police reports are not admissible, [and therefore are] not sent to the jury room.").) So Dixon's testimony, seemingly adopting part of the statement, was the only evidence of it. <u>Fifth</u>, the trial judge addressed the request made by the jury during deliberations to review Mr. Dixon's statement as follows:

> I have your note [which, in part] reads, "We would like to see the police report given by Mr. Dickson on September 10th." I believe you're referring to the statement that Mr. Dickson made on that date, September 10th, to the Plainfield Police. I cannot provide that to you. You can only be given those items which have been received as exhibits in evidence during the course of the trial. You have all of the exhibits. So any other documents that may have been referred to during the course of the trial or other things that may have been referred to, not received in evidence; and, therefore, cannot be provided to you. They're not exhibits.
>
> Of course, any testimony about those things is evidence, so you can consider the testimony as you recall it, but the item itself cannot be provided to you, it's not an exhibit.

(Jan. 14, 2003 Trial Tr. vol. 3, 8:19-9:10, ECF No. 14-41.)

Tellingly, at no point did Petitioner object to the trial judge's response to the jury's request. (*See id.* at 7-11.) The first time he objected was during his second PCR hearing on February 15, 2013, when he raised this contention orally. (*See* Feb. 15, 2013 PCR Hr'g Tr. 6, ECF No. 14-45.) On June 4, 2013, the PCR court issued a formal order and accompanying written decision denying Petitioner's second PCR petition, in its entirety, as procedurally barred. (ECF No. 14-27.) In so doing, the PCR court did not specifically address the merits of Petitioner's claim regarding the jury's inability to review Mr. Dixon's September 10th police statement during deliberations. (*Id.*)

The Appellate Division affirmed the PCR court's denial of Petitioner's second PCR petition "for the reasons stated" in the PCR court's June 2013 written decision, *i.e.*, as

procedurally barred. The Appellate Division also, however, "considered the substance of" Petitioner's argument that the PCR court "failed to address a point raised during the oral argument . . . about the jury requesting to see a police report that was not admitted in evidence." *State v. Venable*, No. A-0999-13T3, slip op. at 11 (N.J. Super. Ct. App. Div. July 13, 2015). Ultimately, however, the Appellate Division found that argument to be "without sufficient merit to warrant discussion in a written opinion." (*Id.*)

I am unable to find fault with any of the foregoing rulings of the state courts. Even if I were to disagree, however, Petitioner's claim that the trial court improperly denied the jurors request to review a copy of Mr. Dixon's September 10th police statement fails to provide a basis to grant Petitioner habeas relief. As an initial matter, it appears that I am precluded from considering this portion of Petitioner's Ground Four claim under the doctrine of invited error. This doctrine prevents a habeas petitioner from raising a claim challenging an action of the trial court which was invited or induced by that petitioner or by that petitioner's attorney. *See, e.g.*, *United States v. Maury*, 695 F.3d 227, 256-57 (3d Cir. 2012); *see also Cusumano v. McFarland*, No. 1:04-cv-5080 (RBK), 2006 WL 1455785, at \*4-5 (D.N.J. May 18, 2006). This doctrine provides an independent basis to reject claims raised in § 2254 habeas matters. *See, e.g.*, *York v. O'Llio*, No. 2:13-cv-7609 (JLL), 2016 WL 5938700, at \*10-11 (D.N.J. Oct. 11, 2016), *cert. of appealability denied* (3d Cir. Nov. 3, 2016); *Burns v. Warren*, No. 1:13-cv-1929 (RBK), 2016 WL 1117946, at \*28-29 (D.N.J. Mar. 22, 2016); *Reddick v. Warren*, No. 2:12-cv-7875 (SDW), 2016 WL 29261, at \*12 n.3 (D.N.J. Jan. 4, 2016); *Cusumano*, 2006 WL 1455785, at \*4-5.

Even if this contention were reviewable, and even if it had merit, I would still reject it under the "invited error" doctrine. The record of trial proceedings unquestionably demonstrates (1) that the trial judge provided Petitioner – through counsel – ample opportunity to object to the

trial court's decision to deny the jurors' request for a copy of Mr. Dixon's (non-evidentiary) September 10th police statement; (2) that Petitioner never objected or even expressed any dissatisfaction regarding that decision. Because "Petitioner, through counsel, consented to and approved of the course of action taken . . . he cannot [now] cry foul as to the action in question." *Reddick*, 2016 WL 29261, at *12 n.3.

The opening statement of Petitioner's trial counsel fully anticipated that the jury would be unable to review reports during deliberations. *See* pp. 24–25, *supra*. Counsel's opening seems designed to prepare the jury for a defense strategy of drawing on reports selectively, but admitting them in evidence piecemeal, if at all.

Most fundamentally, Petitioner cannot cite any clearly established federal law that entitles him to have had the jury obtain a copy of a co-defendant's police statement that was never admitted into evidence. "Under AEDPA, an application for habeas relief shall not be granted for any claim adjudicated 'on the merits' in state court unless the state court's adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established *Federal law*.'" *Lamas*, 850 F.3d at 133–34 (quoting 28 U.S.C. 2254(d)(1)) (emphasis added); *see also Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997) ("To obtain habeas corpus relief [a petitioner] must demonstrate that the mistake deprived him of a right which he enjoyed under the Constitution, laws, or treaties of the United States."); *see also* 28 U.S.C. § 2254(a). Here, Petitioner cites no federal precedent that constitutionally entitles him to have had the jury review Mr. Dixon's police statement during deliberations, and he points to no recognized defense of which he was deprived of by the trial court's ruling on this issue. *Rosemeyer*, 117 F.3d at 111.

Finally, there was no prejudice in the sense of an adverse influence on the jury's verdict. *Fry v. Piller*, 551 U.S. 112, 116 (2007). The quoted portion of the police statement appears to inculpate Petitioner; defense counsel's selective use of it to impeach the accuracy of Dixon's testimony was perhaps the most that could be done with it. There is no demonstration that the statement contained anything that would have altered the jury's deliberations if they had seen a copy. *See id.* (when raised on collateral review, errors of even a constitutional dimension will be considered harmless and thus will not warrant habeas relief "unless [the alleged constitutional error] had a substantial and injurious effect or influence in determining the jury's verdict."); *see also Brecht*, 507 U.S. at 631 (1993); *accord Neder v. United States*, 527 U.S. 1, 8 (1999) ("there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.")

In light of the forgoing, I find that the portion of Petitioner's Ground Four assertion regarding the jury's inability to review Mr. Dixon's September 10th police statement provides no basis for habeas relief. The arguments advanced in support of this claim were "adjudicated 'on the merits' in state court" and Petitioner has failed to demonstrate that "the state court's adjudication [of that claim] 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law.'"). *See Lamas*, 850 F.3d at 133-34 (quoting 28 U.S.C. 2254(d)(1)). I will accordingly deny habeas relief as to this portion of Petitioner's Ground Four argument.

**G. Denial of Second PCR Petition**

Petitioner asserts that his second PCR petition should not have been procedurally barred. (Am. Pet. at Ground Four, sub-point A.) The procedural background is as follows: On June 3, 2013, the PCR court issued a written decision denying Petitioner's second PCR petition as being

"procedurally barred from being heard pursuant to [New Jersey Court Rules 3:22-12(a)(2)(B) and (C)]" (*see* ECF No. 14-27 at 4) The Appellate Division affirmed this denial "for the reasons stated in the thorough decision of [the PCR court] dated June 3, 2013." The Appellate Division noted in addition that Petitioner's second PCR application was filed "far beyond the one-year limitation period fixed by [New Jersey Court Rule] 3:22-12(a)(2(B)." *Venable*, No. A-0999-13T3, slip op. at 4-5, 6 (N.J. Super. Ct. App. Div. July 13, 2015).

"[T] he federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation." *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998); *see also Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2004) ("habeas proceedings are not the appropriate forum for [a petitioner] to pursue claims of error at the [State's collateral] proceeding."). And of course, as set forth above, habeas relief is confined to violations of the Constitution, laws or treaties of the United States. *See* 28 U.S.C. § 2254(a). Claims based on state law error are not cognizable. *See Estelle v. McGuire*, 502 U.S. at 67-69.

For all of those reasons, Petitioner's claim that the PCR court erred in finding his second PCR application was procedurally barred under the New Jersey Rules of Court fails to present a valid basis for federal habeas relief. *See Maples v. Warren*, No. 3:12-cv-933 (BRM), 2016 WL 7104894, at *21 (D.N.J. Dec. 6, 2016) (same). Accordingly, this claim is denied.

## H. Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner

satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). I find that this standard is not met, and I will not order the issuance of a certificate of appealability.

## V.    CONCLUSION

For the reasons stated above, the habeas petition is denied. A certificate of appealability shall not issue. An accompanying Order will be entered.

Dated: June 4, 2018

KEVIN MCNULTY
U.S. District Judge